GOEBEL, Respondent, v. GENERAL BUILDING SERVICE COMPANY, d/b/a EDWARD PASSO, Appellant.*

*November 24, 1964—January 5, 1965.*

* Motion for rehearing denied, with costs, on March 9, 1965.

For the appellant there was a brief by *George D. Young* and *John H. Ames,* both of Milwaukee, and oral argument by *Mr. Ames.*

For the respondent there was a brief by *William F. Quick* and *E. Ace Bernstein,* both of Milwaukee, and oral argument by *Mr. Bernstein.*

CURRIE, C. J. The issue on this appeal is whether the trial court erred in denying the motion for directed verdict.

The question in the verdict which inquired whether defendant was negligent read:

"Was the defendant, General Building Service Company d/b/a Edward Passo, by its employees or agents, negligent with respect to the method in which it carried out certain repair work on the coping stones of the State Office Building?" [1]

---

[1] No question was included in the verdict grounded on alleged failure of defendant to provide plaintiff with a safe place of employment under the safe-place statute, sec. 101.06, Stats., and no question relating to the applicability of the statute was presented or argued on this appeal.

The test to be applied in determining whether it was error to have denied the motion for directed verdict is whether there is any credible evidence in the record, which, giving it the most favorable construction, will sustain the jury's answer "Yes" to this question. *Schiller v. Keuffel & Esser Co.* (1963), 21 Wis. (2d) 545, 124 N. W. (2d) 646. A resumé of the material evidence bearing on the issue of defendant's negligence follows.

The state, owner of the building to be repaired by defendant, did not turn over possession to defendant during the course of performance of defendant's contract but continued to occupy the building. The contract provided that the state as owner and its representative, appointed by the state chief engineer and given the title of "Building Construction Superintendent," should at all times have access to the work wherever it was in preparation or progress.

The contract contains this general explanation of the work required to be performed under its terms:

"The work includes, Steel Scaffold; Repairs to Masonry Coping and Masonry Pointing, Flashing, Gutters, Conductors, Remove part of Cupola, Roof remaining part of Cupola, Replace Ridges, Check all Flashing; Painting all Gutters, Conductors, Flashing, Ridges, Bays, Belts, Parts of Cupola; and all Door and Window Frames.

"Present Terra-Cotta Coping will be either repointed or removed where loose and reset in mortar. All other Terra-Cotta on the west, north, east and south elevations will be tuck pointed."

This specific provision relating to the terra-cotta coping was also set forth in the contract:

"Care must be used in removing the loose units of Terra-Cotta. These removed units to be cleaned free of all mortar as well as the bed and then relaid. All joints in Terra-Cotta, glazed tile coping, brick, and stone work must be carefully cleaned of loose or deteriorated mortar."

Although the contract acknowledged the right in defendant to subcontract any of the work, the defendant agreed to be fully accountable to the state for the acts and omissions of the subcontractors.

Messmer, the architect who had prepared the plans and specifications for the work that were incorporated into the contract, when asked who had control of the work during the performance of the contract, testified, "The general contractor together with the architect and the state representative." The contract provisions substantiate the correctness of this statement. While defendant, as general contractor, was required to provide competent and efficient supervision of the work, the contract also provided:

"The Architect shall have general supervision and direction of the work. . . .

"He shall make decisions on all matters relating to the execution and progress of the work, and to the interpretations of the Contract Documents. His decisions are subject to review by the State Chief Engineer or by arbitration. The Building Construction Superintendent, appointed by and responsible to the State Chief Engineer is the Architect's immediate representative on the site of the work, with all the duties and responsibilities of the Architect.

"He has the authority to act for the Architect in all matters relating to the prosecution of the work and its installation in accordance with the specifications. He is also the Owner's authorized representative in all matters requiring Owner approval or participation."

The building was seven stories high. The west elevation of the building had three dormers projecting out of the roof in the general shape of inverted "Vs" and each of these dormers had terra-cotta coping. At the lower edge of the roof out of which these dormers projected there was a line of gutters. On the morning of October 19, 1960, plaintiff was sent to the building by his employer who had a subcontract from defendant to do the sheet metal work. Plain-

tiff's mission was to measure the gutters. On arriving at the building he found that the framework of a steel scaffold had been erected across the entire west side of the building to a height of about three feet below the gutters. The construction of the scaffold constituted part of the work to be performed by defendant under the contract. Defendant had subcontracted the erection of the scaffold. Plaintiff stood on the platform of a fire escape and placed a painter's plank across the top of a section of this scaffold, and then crawled or walked out on this plank to measure the gutters.

While standing at the right of the south edge of the north dormer, he stretched out with his back in a somewhat horizontal position to measure a portion of the gutter to the south. While in this position a piece of the coping, which he described as a "stone," fell approximately two and a half to three feet and struck him in the lower back. Plaintiff then reached back and with his left hand pushed the "stone" into the gutter where a fellow employee observed it a day or two later. Plaintiff described this piece of coping as having dimensions of 20 by 14 by 14 inches and estimated its weight to be from 30 to 40 pounds. He stated it had fallen from the lower southerly corner of the dormer. There were no eyewitnesses to the accident other than plaintiff.

The architect Messmer testified that there was only one chance in a million that this piece of coping could have fallen without some outside force being exerted on it. He explained that the piece of terra-cotta that fell was supported in place by the piece below which formed a base large enough to provide such support. Plaintiff, however, denied that he touched the piece of coping that fell prior to the accident. Messmer also testified that "at the time we got the order to make inspection for the state of Wisconsin of this building," he had gone up on top of the roof and walked along and looked "at all of these copings." He also had

stood across the street and examined the copings with high-powered field glasses. There was nothing noticeable to which Messmer called attention to the state regarding the two northerly dormers of the west elevation. He did call attention to the third piece of terra-cotta from the top in the coping of the south dormer which projected out about one-half inch and was in a dangerous position. This was two dormers removed from the place where plaintiff was injured. After the scaffold was erected Messmer made a further inspection from it and saw nothing dangerous that needed immediate attention except this projecting piece of coping in the south dormer. Messmer asked defendant to remove that particular piece first. He further testified that there was no noticeable deterioration at the place where the accident occurred.

The record is silent as to what masonry work, if any, had been done by defendant between the time work commenced on the contract on October 10th and the accident to plaintiff on October 19th. The only work mentioned by architect Messmer as having been done during that period was the erection of the steel scaffold across the entire west side of the building and the removal of the cupola on the roof by the sheet metal contractor. Messmer estimated that computed on a cost basis, 30 percent of the contract had been performed by October 19th but stated that construction of the scaffold constituted the major item to be performed under the contract. Plaintiff called defendant as an adverse witness but asked him no questions concerning his performance of the contract. All witnesses who testified were called by plaintiff, none having been called by defendant.

On this appeal plaintiff places his chief reliance on the application of the doctrine of *res ipsa loquitur*. The cases recognize that the doctrine of *res ipsa loquitur* may be applicable in situations where someone is injured by the falling of part of the exterior structure of a building. *Both v.*

*Harband* (1958), 164 Cal. App. (2d) 743, 331 Pac. (2d) 140; *Cooper v. 804 Grand Bldg. Corp.* (Mo. 1953), 257 S. W. (2d) 649. See also Annos., "Liability for injury to person in street by fall of part of structure of completed building," 7 A. L. R. 204 and 138 A. L. R. 1078.

In the instant case the jury was given this instruction:

"Also, with respect to your answer to Question No. 2, inquiring as to the negligence of the defendant, you are instructed that if you find the defendant had the right to control the repair work on the coping stone, and if you further find that the accident claimed is of a type or kind that ordinarily would not have occurred had the defendant exercised ordinary care, then you may infer from the accident itself and the surrounding circumstances that there was negligence on the part of the defendant, unless the defendant has offered you an explanation of the accident which is satisfactory to you."

This instruction closely follows that set forth in Wis J I—Civil, Part I, 1145, and approved in *Turk v. H. C. Prange Co.* (1963), 18 Wis. (2d) 547, 119 N. W. (2d) 365. However, with respect to the element of exclusive control it is phrased in terms of "exclusive right to control the repair work on the coping stone." The propriety of referring to the repair work is questionable. There is a complete absence of any evidence that on the day of the accident defendant was engaged in making any repairs to the coping anywhere on the west side of the building. There is no evidence that defendant had a duty to commence such coping repairs by that time. However, the most serious objection is that no *res ipsa loquitur* instruction should have been given because the undisputed evidence establishes that defendant had neither exclusive control over the coping stone which fell nor the right to exercise such exclusive control.

Exclusive control by defendant of the instrumentality causing harm is one of the two essential elements in Wiscon-

sin necessary for application of the doctrine of *res ipsa loquitur. Turk v. H. C. Prange Co., supra.* At page 557 of the *Turk Case* it is stated, "*Koehler v. Thiensville State Bank, supra* [ (1944), 245 Wis. 281, 14 N. W. (2d) 15], established the Wisconsin rule that *right to control* is the important factor and actual exclusive control is not necessary." In the *Koehler Case* defendant bank attempted to avoid application of *res ipsa loquitur* on the ground that it had employed someone else to inspect the instrumentality which caused the harm and thereby lost the exclusive possession or control over it. This court held that the bank could not delegate its duties with respect to inspection so as to escape liability and therefore the inspection must be considered to have been within its control. An equivalent situation would exist in the instant case, if plaintiff's suit were being maintained against the state as owner (assuming the state had given its consent to being sued), and the state would advance the argument that it did not have exclusive control over the replacement of loose coping stones because it had delegated their repair to the instant defendant as general contractor.[2] The problem confronting us, however, is not whether a *res ipsa loquitur* instruction would be proper if the action were against the building owner, but whether it constituted error to give it against defendant contractor.

We are satisfied that defendant did not possess such right of exclusive control as would warrant the giving of a *res ipsa loquitur* instruction. Plaintiff attributes negligence to defendant in that he had not reset in mortar the falling

---

[2] In *Weber v. Hurley* (1961), 13 Wis. (2d) 560, 109 N. W. (2d) 65, and *Potter v. Kenosha* (1955), 268 Wis. 361, 68 N. W. (2d) 4, it was held that, where the owner of premises turns over premises *in a safe condition* to a general contractor, the owner is not liable for a hazardous condition thereafter created by the contractor, even though the owner retains the right of inspection.

coping stone prior to permitting plaintiff to use the scaffold for measuring gutters. However, either the architect or the state's representative on the job had the right under the contract to direct defendant to perform any other part of the masonry repair work before resetting this particular stone.

If the jury's finding of negligence on the part of defendant is to be sustained it must be on the basis of evidence of specific acts of negligence on his part. Plaintiff relies upon a provision appearing in the instructions to bidders made available to defendant before he submitted his bid from which the contract resulted. This read, "The bidder shall also visit the site and acquaint himself with all existing conditions affecting the execution of the work to be included in the contract." The obvious purpose of this provision is to protect the owner against a future claim by the contractor for additional compensation above the contract price because of the conditions unknown to the bidder which resulted in extra expense in performing the contract. This clause does not have the effect of relieving plaintiff from introducing evidence that defendant was negligent in failing to discover the dangerous stone. While the plans and specifications constituted notice to defendant that some coping stones would have to be reset in mortar and others repointed, they did not apprise defendant that the condition of this particular stone was dangerous.

Whether the verdict against defendant can be sustained on the evidence presented boils down to whether there is evidence which would warrant the jury in concluding defendant was negligent because he did not discover this coping stone constituted a dangerous condition. There can be no argument that, if defendant had made such discovery, the exercise of ordinary care would have required that he not have permitted plaintiff to use the scaffold until this piece of coping had been removed and reset in new mortar. The

only direct evidence bearing on the issue of defendant's failure to discover the danger by proper inspection is the evidence adduced by plaintiff in the testimony of architect Messmer previously summarized herein. Plaintiff called Messmer as plaintiff's witness. While his testimony that careful inspection had disclosed no evidence of a dangerous condition would not be conclusive upon the jury if there were other evidence that a proper inspection by defendant should have disclosed a dangerous condition, such other evidence is entirely lacking. On the face of this record there is no evidence which would support a finding that defendant was negligent in failing to discover that a dangerous condition existed.

We are constrained to hold that there is no evidence to sustain the jury's finding that defendant was negligent in the method in which he carried out the repair work on the coping stones. Therefore, it was error not to have granted defendant's motion for directed verdict.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint upon its merits.

GORDON, J. (*dissenting*). I do not believe that the plaintiff's action should be dismissed. While the trial court's instruction regarding *res ipsa loquitur* may necessitate a new trial, I must respectfully dissent from the direction for dismissal.

The defendant contractor was aware that there were loose stones in the upper regions of the building. At the time the plaintiff sustained his injury, the contractor had completed 30 percent of the reconstruction. In view of such facts, can it be said that this plaintiff has no case as a matter of law? In my opinion, there may be a valid cause of action for this plaintiff under the concept of duty discussed in *Dwyer v. Jackson Co.* (1963), 20 Wis. (2d) 318, 121 N. W. (2d) 881.

In the *Dwyer Case,* the plaintiff was injured when the folding chair in which she was sitting collapsed. A jury finding in favor of the plaintiff was sustained. There was evidence that the chair was old and that the defendant had previously destroyed a number of such chairs because of their being out of shape. With reference to the defendant's duty, the court said, at page 323:

"His duty includes reasonable inspection. He is not liable for injury caused by a latent defect which would not have been revealed in the course of reasonable inspection. . . . The jury could reasonably believe that an employee, making a reasonably careful inspection, would have noticed the same condition and removed the chair. The inspections made by the manager and the maid may have been deemed somewhat casual. The jury could consider that the age of the chair and the experience the hotel had had with similar chairs called for closer scrutiny."

In the instant case, the contractor knew of the disrepair of the terra-cotta coping. Under the *Dwyer Case,* he had a duty to inspect, and a jury question was presented as to whether such inspection was reasonable.

The jury evidently considered that the situation was a dangerous one, because it assessed 39 percent of the negligence upon the plaintiff. I do not think it just to rule as a matter of law that the defendant was free of negligence. I would order a new trial.

I am authorized to state that Mr. Justice FAIRCHILD joins in this dissent.